Good morning, Your Honors, and may it please the Court. Erin Murphy on behalf of Petitioner Ricardo Rivera-Gomez. The BIA made two clear legal errors in denying Mr. Rivera-Gomez's motion to reopen. First, the BIA affirmed the immigration judge's erroneous conclusion that gang-related asylum claims fail as a matter of law. As this Court recently made clear in Pirro-Bach, that is no longer the case to the extent it ever was after the BIA's intervening decision in matter of MUBG. And the second error the BIA made is that it dismissed Mr. Rivera-Gomez's material new evidence because it was not categorically different from evidence that he could have presented in 2003. But once again, that is not the correct legal standard because this Court's case has made clear that an applicant does not need to establish an entirely new basis for asylum in a motion to reopen. Instead, he simply needs to present material new evidence of changed circumstances in his home country, which was what he did. If he had applied for asylum originally, which he did not do, would he have a better argument before this Court? Well, I think his asylum claim is stronger now than it would have been in 2003. But obviously the fact that we're here. But procedurally, we're here on a motion to reopen. Absolutely. And it's abuse of discretion. And that – and I'm not sure that the cases that you cite now anyway, do we really know they have a retroactive effect? Well, I don't think it's a retroactive effect because this is an ongoing proceeding in the motion to reopen that has not been closed yet. But in all events, I mean, what – I guess he didn't ever ask for asylum, right? No. But it was part of the – it was the legal theory on which his prima facie case was denied in his motion to reopen. The immigration judge said quite clearly that gang-related claims fail as a matter of law and cited cases from the BIA and from this Court that this Court and the BIA have both now said that's an incorrect reading of those cases. So I think on that point, there can really be no dispute that they applied the wrong legal standard in believing that a gang-related claim simply cannot succeed no matter what evidence is in the record. And what's important about that is – But it was also that you had all of those. There was definitely – there was a lot of things that happened to his family already back when he did not apply for asylum. And they're just saying it's more of the same. It's just that's what the problem is, and so it's not really new. Certainly. And I actually – I mean, there's clearly new evidence in the record here. And I think that evidence is material under the standard established in cases like Bassin and Malti. And I would point in particular, for instance, to the 2010 incident when he discovers after the fact from this incident for the first time that he's on a hit list that's distributed countrywide. Now, to the extent that it might have been suggested back in 2003 that this was a localized problem, that evidence is very material to the question of whether it is a localized problem, whether it's something that he could avoid through relocation, which puts – I have a question. Just sort of generally, it's just apparently his mother got asylum, right? Yes, that's correct. And I'm trying to, from the standpoint – the IJ did not make an adverse credibility, but findings specifically, but seemed to have problems with some of the things. But it's not there. Is there anything in the record that indicates that this – that your client is basically a gangbanger that brought all of this upon his family? There is absolutely nothing in the record to that effect. There's never been any suggestion that he actually was a member of this gang. And he has put forward a number of affidavits, not just from his mother, but from other individuals documenting that he was recruited for the gang, refused to join, and that's the basis for the persecution against him and members of his family. And have you asked the government to mediate this in light of the mother's asylum? Or was there ever any discussion about that? I don't know if there's been any discussion. I don't think there's been any, you know, interest indicated to us in looking at this again in light of the mother's claim, which, you know, had happened before the motion to reopen and the government took the position that it was just not really relevant here. And, I mean, I do think it's relevant. And in particular, you know, it's very troubling that the immigration judge, he never makes a credibility, an adverse credibility determination, but goes out of his way to suggest, you know, that my client is just lying about all of this, when you have another immigration judge that just months before had heard testimony from his mother, witnessed her tell the same story, and found her credible and granted her asylum. So for another immigration judge to come along and just look at the cold record and try and pick out, you know, here and there, wherever he could, some sort of minor indiscrepancies, I think it just puts a kind of a skew on these proceedings that is really not in keeping with this Court's rule, that you have to accept the allegations as true in the context of a motion to reopen. How is his evidence now qualitatively different than what he could have presented in 2003? I mean, I think it's qualitatively different in a couple of ways. You know, he had one family member that had been murdered by the gang before 2003, but he has additional family members who have since been targeted, and targeted 10 years after the fact, which in and of itself shows, you know, to the extent that it might have been suggested that this problem went away 10 years ago. That's obviously not the case. As I mentioned earlier, I think that the hit list, the black list, which was something that they didn't know about until 2010, when the gang came back to his sister-in-law's residence, still looking for them, changes, you know, is material to the analysis in that it affects the localized versus nationwide nature of the problem. And then I would couple in with all of that. I mean, changes in the country have occurred in many respects over the past few years. The 2009 military coup? There was a coup, and there's been changes in leadership since, and all evidence has just shown that crime and gang-related crime and all crime has dramatically increased. And I think there's actually a tie here. I mean, we had an expert opine that there was a tie here, because the government itself is more than happy now to turn a blind eye to an increase in gang violence, because the government is perpetrating its own acts of persecution and likes to use the gang violence for cover. So there's this kind of connection between all of this. And even as gang-related violence has actually decreased in a few other countries, it's continued to increase in Honduras, and the murder rate has gone up dramatically and is the highest now in the entire world. So how would you have us define his particular social group? I think his social group is basically exactly the same as in CureVac and as in MEVG. It's individuals who are actively targeted by a gang for recruitment and refuse to join. And I think, you know, that actively targeted aspect of it, which also was satisfied in those cases when they were remanded, is important, because it's what distinguishes him from somebody who just says, you know, I don't really want to join a gang. I mean, it's very different to be someone who the gang has, you know, may think it was an MEVG. They'd, you know, caught up with the guy and beaten him up and said. Do we need to determine his group here, though? Is it just whether there was an abuse of discretion as to wouldn't that group be determined if it were remanded? I think it's a question that can be dealt with on remand. I mean, I do want to be clear. I think there's actually legal error here that, you know, independent from any concept of abuse of discretion, because the court, the BIA and the IJ were wrong to believe that these claims failed as a matter of law, regardless of what evidence he could show. So I think the appropriate thing here would be to send it back down and say, you know, you need to take another look at all of this in light of the fact that the legal standard that you thought was governing both on a prima facie case and on materiality was the incorrect legal standard. If I may, I'd like to resort to the remainder of my time. Thank you. Good morning. Good morning. May it please the Court, I am Sarah Byram, appearing on behalf of the Attorney General. Just to note at the outset before I begin my argument, Petitioner's argument that remand is warranted because the board erred in not addressing the particular social group is insufficient. Here this case is a motion to reopen. The board can independently deny a motion on any three dispositive grounds. They based it on no material unavailable evidence and also an abuse of discretion, though each of those bases was an appropriate basis for which the board could deny Mr. Riviere-Gomez's claim. And to the extent that Petitioner wishes this Court to remand for the board to again address the particular social group claim, the Court would need to find that the board abused its discretion in either finding. But in this case, I asked counsel for Petitioner, what explains the different outcomes in his case as opposed to his mother's case? Well, in this case. I mean, I realize that's not dispositive of this, but it's always a little bit troubling. Yes. In this case, he is on a motion to reopen, so it's a different procedural posture than his mother had. His mother filed an asylum claim directly in her removal proceedings, so her burden was different. And asylum cases are adjudicated on a case-by-case basis. I can see for the panel how this could be troubling, but at the same time, Petitioner had an opportunity to apply for asylum. He could have applied in 2003. He chose not to. He chose to return. And now, as a result, he has a higher burden in trying to get the agency to relook at his asylum claim this time around. Well, the agency has discretion in instances to look at, see if there's any. Is there a reason that's not in the record that he's not considered desirable? For asylum or to reconsider? Yes. I mean, is there something in the record? Does the government think that he was really a gangbanger and that his family got retaliated because of that? Or what's really going on here? In this case, the government believes that, you know, first the board did not abuse its discretion in considering the bases they did, and those bases are not arbitrary or irrational, so they can be upheld. Second, the government views this case, if we're discussing his asylum claim, as simply a matter of personal revenge and retribution. All these incidents stemmed from his team, his soccer team, winning a match. Are you not really seriously telling us that the reason this whole family is on a hit list and they're all being persecuted is because of that soccer game? Do you really seriously believe that? The facts in the record indicate that that is the basis, and Petitioner in his asylum claim, in his statements, have indicated that that was the basis. Whether it has morphed after that, that's something that the board should consider or decide if it's on remand, but we don't believe that it should be considered. Well, doesn't he also include that he was kidnapped and that the people, that family members that, you know, were told to pay for, you know, he was kidnapped by the gang, and then the people that came to see him, then they could identify the gang, and those are the. He does allege all those things. And all those things happened, though, prior to his removal proceedings in 2003 when he could have applied for asylum at that time. Okay, but I guess that what you're just saying, the whole reason for why this happened was a soccer match. Yes. But there is more in the record than that, isn't there? There are additional facts in the record, but it's our position that they all stem from this anger over losing the soccer match and every incident after that was taken in revenge against him for that. Well, but if there's, if there wasn't an adverse credibility, isn't he entitled to all inferences? They didn't, you know, that's why I'm asking. They didn't say they didn't, they didn't, the IJ seemed to think that, had problems with what he said, but didn't make an adverse credibility. So then don't we have to look at that people in his, whether, you know, whether we believe that, you know, whether that's a reasonable inference, that his sister got, you know, was raped and, you know, I don't know, they tried to kill her as someone else in the family was killed and there were just all sorts of things that happened, that it was a soccer match, bet? In this case, what the board held was that his motion was denied for previously unavailable material evidence. That's an independent basis they can make. They don't even need to consider his prima facie asylum eligibility claim in making that determination. They didn't consider it here and they didn't need to consider it here. And to the extent he now alleges these new incidents, even if the agency found him credible, that doesn't necessarily mean that his incidents are sufficient to meet his burden. And here, in addition, his new evidence that he claims, this hit list and this incident on his sister, they're not qualitatively different from his other events. And that's what he needs to show. He needs to show that these new incidents are qualitatively different than the incidents that he could have provided had he filed for asylum. Here, they're not. The gang had already killed his brother in 2001, left a note on his brother saying, you know, we'll get the rest. He could have brought that in 2003. The hit list, the fact that now they put these photos and put these threats in a physical piece of paper or in a physical document like that, is really not qualitatively different than the threats that existed before. Really? When they have his name and his picture on a hit list that's passed throughout the country? You're really arguing that's not qualitatively different than what happened before 2003? No, because in 2003, in his removal proceedings, he knew that he was on a hit list. Because when the gang allowed him to leave for his uncle's funeral, the gang took pictures of all of his family and explicitly told them that if he did not return, that they would kill his family. As a result, they fled Honduras. They clearly took these threats seriously and then proceeded to kill his brother in 2001, prior to his removal proceedings. And at that point, Petitioner was well aware that they were intending and good on carrying out the threats that he knew existed long before. All right, counsel. What about the fact that the BIA and the IJ don't even mention the 2009 military coup, which is discussed in the country reports? To that point, the board considered, by reference to the immigration judge's decision, the country conditions, and they don't need to necessarily address every incident, but it's required that they give reason, consideration, and the presumption is that they've considered everything. Don't you think that's a fairly significant event? And has dramatically changed? I mean, there's an expert report in there that the coup has had the result of dramatically increasing the level of gang violence and the lawlessness with which they act and, you know, aren't punished? Although the agency didn't consider the 2009 events, it's our position that, regardless, this case is about Petitioner's knowledge that the gang had made these threats and was interested in him and after him, and he knew that at the time of his proceedings. This is evidence that he could have presented. Well, what's your bigger concern here, that if he gets relief, then everyone will get relief? Or what's the, I mean, it's, or, you know, I'm just trying to sort of understand that, because the facts, you know, the facts are fairly sympathetic unless he's the cause of all of it, but I'm not, I can't find anything in the record that says he's the cause of all of it, and it seems that the government's playing pretty much hardball on this, and so is it that this is going to open the, you know, on the standard of review that you're just saying, you know, that's, you know, I'm just, you know, I see a lot, we see a lot of these cases, and I'm just sort of trying to understand the government's hardball position on this. Our position is simply that, while we recognize that the facts are sympathetic, what Mr. Riviera-Gomez is attempting to do now is to get a second bite at the apple.  the immigration doesn't recognize this. If he had presented asylum back eight years ago or however long ago it was, and it was denied, and now he's, if he were filing a motion to reopen now, would he have a better argument before the court? He would have a better argument before the court, because at that time he would have attempted to file asylum. He would have attempted that avenue. That avenue did not, you know, assuming he lost, pan out for him, and then he could have come back and filed these new incidents and alleged at that time that... So that's his real problem from your perspective, that you might look at him more favorably had he previously filed for asylum? Perhaps we may have, because Mr. Riviera-Gomez put himself in this position that he's in. He could have applied for asylum in 2003. He gives no indication why he never did that, despite these incidents, and he voluntarily chose to return to Honduras. Now he's tasked with the burden, the higher burden, and he can't meet that burden. Okay. I understand your argument then. Thank you. If there are no further questions, I'll sum up. I think you're over your time. Oh, excuse me. Thank you. Just a few quick points. Mr. Riviera-Gomez explained why he didn't seek asylum in 2003. He was 19 years old at the time. He didn't know the language. He didn't know the country. He didn't know anything about immigration proceedings, and he was terrified that his mother... Well, so everyone then could come 20 years later, could come, all of these things, and so I get what your concern is. The last step of what I was going to say is important here. He was terrified that his mother was back in Honduras and going to face violence and be murdered by this gang, which is the reason that he decided under the circumstances it would be better for him to just go back there and try and protect her. And he raised this claim later when he learned that there was a possibility to raise something such as a motion to reopen and try and make these arguments. Just a couple other things. I do think that the BIA here did actually rule on the Prima Facie case argument if you look at it. They say, you know, we agree there was no Prima Facie case, and then they say we also agree on material new evidence. So the government's position that that was not part of the case, to me, is just not really a fair reading of what the BIA said here. And this, you know, I also would come back to the notion that, obviously, the record makes clear this is not about a soccer match. This is about a gang that kidnapped him, told him, if you join us and murder some of our rival gang members, then we will, you know, all of this will come to an end. We will stop coming after your family. That puts him right in the heartland of the kind of claims that were made in MABG and in Pure Bock. So if there are no further questions. Thank you, counsel. The case is here. It will be submitted.
judges: REINHARDT, WARDLAW, CALLAHAN